UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

SHONTAY D. JOHNSON,

          Plaintiff,

        v.                              Case No.  15-C-0554

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

          Defendant.

DECISION AND ORDER AFFIRMING COMMISSIONER'S DECISION

Shontay Johnson appeals the Commissioner's denial of disability insurance benefits (DIB) and Supplemental Security Income (SSI).  This is Johnson's second appeal.  The court remanded her case in 2013 with instructions to the Commissioner to reconsider credibility, treating-physician evidence, and residual functional capacity (RFC).

Prior to the remand, Johnson and a vocational expert testified at a hearing in September 2010 before Administrative Law Judge (ALJ) William Zellman.  Upon remand, the Commissioner reassigned the case to ALJ Zellman who conducted a second hearing in September 2014 and considered a large quantity of additional medical evidence.  At both hearings and proceedings in this court Johnson was represented by counsel.

Johnson seeks judicial review pursuant to 42 U.S.C. § 405(g), claiming disability beginning July 26, 2007.  The ALJ found that Johnson was insured through either June 30, 2011 (Tr. 637) or June 30, 2012 (Tr. 639), and she does not dispute the accuracy of either date.  As the ALJ found that Johnson was not disabled, even up to the time of his second decision on January 20, 2015, the date did not factor into the benefits decision.

Under § 405(g), the findings of the Commissioner as to any fact shall be conclusive if supported by substantial evidence. The Commissioner's final decision may be overturned only if it lacks support by substantial evidence, is grounded in legal error, or is too poorly articulated to permit meaningful review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) (internal quotation marks omitted). The court views the record as a whole but does not reweigh the evidence or substitute its judgment for that of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). The ALJ is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). This court's review is confined to the rationale provided in the ALJ's decision. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).

To obtain DIB and SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.

The Social Security Administration has adopted a sequential five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The ALJ

2

determines at step one whether the claimant is currently engaged in substantial gainful activity. If not, at step two the ALJ determines whether the claimant has a severe physical or mental impairment. If so, at step three the ALJ determines whether the claimant's impairments meet or equal one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"), as being so severe as to preclude substantial gainful activity. If so, the claimant is found disabled. If not, at step four the ALJ determines the claimant's residual functional capacity ("RFC") and whether the claimant can perform her past relevant work. If she can perform her past relevant work she is not disabled. However, if she cannot perform past work, then at step five the ALJ determines whether the claimant has the RFC, in conjunction with age, education, and work experience, to make the adjustment to other work. If the claimant can make the adjustment, she is found not disabled. If she cannot make the adjustment, she is found disabled. 20 C.F.R. 404.1520; *see Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

RFC is the most the claimant can do in a work setting despite her limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Young*, 362 F.3d at 1000-01. The ALJ must consider all of the claimant's known, medically determinable impairments when assessing RFC. § 404.1545(a)(2), (e).

The burden of moving forward at the first four steps is on the claimant. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *See Young*, 362 F.3d at 1000.

In the present case, the ALJ found in Johnson's favor through the first four steps. He determined that Johnson had the RFC

to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) provided that she is limited to unskilled and routine in nature with no constant decision-making or workplace changes, no constant interaction with others, no production or pace rate work, no frequent or constant postural activities, no rope/ladder/scaffold climbing, no working in hazardous environments or environments that provide ready access to drugs or alcohol, no constant handling or fingering with the nondominant left hand, and no continuous standing or continuous walking for more than 30 min. without a 1–2 minute period of position change.

(Tr. 657.)  The ALJ decided at step five that Johnson was not disabled because there are jobs that exist in significant numbers in the national economy that she is able to perform. (Tr. 651, 658.)  Thus, he found that Johnson was not under a disability from July 26, 2007, through the date of his decision on January 20, 2015.  (Tr. 658.)

## ANALYSIS

Johnson's records show that her predominant issue initially was chronic pain in her arms.  (*See, e.g.*, Tr. 373, 508–09.)  Prior to her first appeal to this court Johnson had been diagnosed at various times with carpal tunnel syndrome (*see, e.g.,* Tr. 323, 373), fibromyalgia (*see, e.g.*, Tr. 593, 596), possible thoracic outlet syndrome (Tr. 383), and chronic pain syndrome (Tr. 533, 548).  Johnson also had complaints of migraines and depression.  (*See, e.g.*, Tr. 595.)  Her arm pain began around July 2007, and she stopped work around that time, though she appears to have attempted to return to work without success between February and May 2008.  (*See* Tr. 460–61.)

Following remand by this court in 2013, the number of medical records in the file increased substantially.  The transcript expanded by over 1000 pages, most of which are medical records.  Complaints expanded to knee pain, neck pain, shoulder pain, back pain, freezing-up of a hand and arm, depression, and bipolar disorder.  (*See, e.g.*, Tr. 1021–22, 1130, 1208, 1217–18.)

4

This court is mindful that it is reviewing only the ALJ's second decision, not his first. In the decision following remand, the ALJ noted the amount of medical evidence and his attempt at "expand[ing]" the prior record "with the goal being to better articulate some of the credibility issues plaguing claimant and the reasons why the undersigned was questioning some of the treating and non-treating source opinions." (Tr. 641.) He then stated that "much of the earlier discussion of the evidence as outlined on pages 4–10 of the December 2, 2010 decision is hereby incorporated by reference (T. 11–17)." (Tr. 641.) However, the ALJ did not say *which parts* of the first decision he was incorporating by reference, and the court cannot tell from other portions of the second decision. Neither party has argued that this court's decision in the present appeal should be based on the first decision as well as the second decision.

A.      Credibility

The ALJ found Johnson not credible regarding the severity of her pain. He recognized the importance of that decision in Johnson's case: "Having reviewed the medical evidence and testimony, this case essentially comes down to the issues of pain and credibility." (Tr. 651.)

In determining the credibility of a claimant's statements, an ALJ must consider the entire case record. SSR 96-7p. This includes the objective medical evidence, the individual's statements about symptoms, statements provided by treating or examining physicians, and any other relevant evidence. *Id.* "[S]ymptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." *Id.* When assessing credibility, the ALJ must consider the individual's daily activities; the location, duration, frequency, and intensity of pain; factors that precipitate or

aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication taken; treatment other than medication that the person has received for relief of pain; any measures other than treatment the person has used to relieve pain; and any other pertinent factors. *Id.* Once the ALJ makes a credibility finding, the impact of the symptoms on the individual's ability to function are considered along with the objective medical and other evidence. *Id.*

An ALJ's credibility finding generally should be sustained unless patently wrong, meaning that it lacks any explanation or support. *See Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008); *Powers v. Apfel*, 207 F.3d 431, 435–36 (7th Cir. 2000).

When remanding this case previously, the court agreed with the ALJ that Johnson's testimony contained numerous instances of exaggeration, such as statements regarding the frequency and duration of her migraines that exceeded the number of days in a month and a report to a physician that her pain was a "25" on a scale of zero to ten. The case was remanded regarding credibility because the ALJ had used language that the Seventh Circuit had rejected in *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), leaving it unclear whether credibility or RFC had been determined first. Further, the ALJ put too much emphasis on lack of medical support for Johnson's complaints of pain, misinterpreted the record regarding Johnson's computer use, and labeled as "inconsistencies" facts that were not actually inconsistent (in particular the fact that Johnson's inability to complete a functional capacity evaluation was *consistent* with her reports of pain).

However, in his decision on remand, the ALJ sufficiently supported his credibility assessment. He provided the logical bridge between the evidence and his assessment by highlighting the lack of objective medical evidence, embellishments in Johnson's testimony,

conflicts between her statements at the hearings regarding her high levels of pain and provider records reflecting her activities, her belief that she could work only if her pain was reduced to zero, her shifting statements to the ALJ and providers regarding her main medical issues, her shifting or vague statements to providers about her conditions, and suspicions of providers (Dr. Ridl in particular) that Johnson exaggerated her symptoms or did not provide full effort during examinations or tests. Hence, the ALJ's credibility determination will be affirmed, as it has substantial support in the record.

The ALJ's discussion of the lack of objective medical evidence for complaints of pain or inability to work was sufficient. He acknowledged that Johnson's x-rays showed mild to moderate degenerative disc disease of the lumbar spine and mild degenerative joint disease of the knees, both possibly aggravated by obesity, as well as a small disc herniation without nerve root impingement. (Tr. 652.) But he also pointed to numerous tests that resulted in normal or negative findings or showed at most mild degenerative changes. (Tr. 643–47, 652–53.) And he observed that regarding complaints of back pain and musculoskeletal issues, Johnson received conservative treatment such as physical therapy, chiropractic adjustments, and pain medications. (Tr. 644.) Though records of Dr. Singhal, a spine surgeon, showed tenderness of back on palpation and slightly decreased range of motion for the lumbar spine on forward flexion, the doctor did not believe surgery was appropriate. (Tr. 645–46 (citing Tr. 1139).) Similarly, Dr. Nwaeze saw Johnson in 2013 for knee complaints but said he doubted surgery was warranted, giving her a prescription for knee braces and injections. (Tr. 647.) Hence, the court's review of the record supports the ALJ on this point; the record contains *numerous* normal test results, at most mild conditions or changes, no surgeries for any of Johnson's ailments, and no

7

invasive treatments other than injections to knees. Her conditions were treated with medications and therapy.

Johnson contends that the ALJ failed to distinguish which diagnostic tests he relied on and to which parts of the body the tests related. The court rejects that argument. Johnson's records exceed 1700 pages and the ALJ discussed her records extensively. His opinion addresses medical records and testing from Drs. Khan, Ahmed, and Ridl; EMG-nerve conduction velocity studies; a CT angiogram; multiple MRIs of the cervical, thoracic and lumbar spine; rheumatological workups; x-rays of the spine, knees, and hand; a bone scan; and a CT-angiogram of the brain. (Tr. 643–44 (citing Tr. 376, 399, 400, 403, Exs. 28F, 58F, 61F).) However, Johnson points to several test results or diagnoses that the ALJ did not discuss, such as Dr. Ahmed's notation of minor abnormalities of waveforms in the left extremity, modest degenerative changes shown in a cervical MRI, and mild narrowing of patellofemoral joints shown in an x-ray. (Doc. 21 at 18.) Regardless, the ALJ was not required to discuss every single piece of evidence across the 1700-page record. His opinion indicates that he considered all of the evidence in some detail, including specific tests Johnson references in her brief. For instance, she contends that the ALJ failed to mention the MRIs at Tr. 1462–63 and 1490–93 (Doc. 21 at 18), but those are part of Exhibit 58F, which the ALJ cited. Likewise, Johnson states that the ALJ failed to discuss an x-ray at Tr. 1593 (Doc. 21 at 18), but that is part of Exhibit 61F, which the ALJ also cited.

Johnson contends that the ALJ's analysis of the medical evidence was not a sufficient basis in itself for his credibility decision. (Doc. 21 at 17.) But the ALJ did *not* base his credibility decision solely on the lack of objective medical evidence, which would

have been improper. Instead, he recognized the need to consider several other factors regarding Johnson's claims of pain. The ALJ recognized that

> [p]ain is a subjective matter and cannot always be established by objective evidence. At the same time, simply making multiple trips to medical personnel complaining of pain, getting a physician to prescribe strong narcotic pain medications, and securing endorsements of disability from some of those same persons, does not mean that the person is in severe pain.

(Tr. 651.) The ALJ pointed to Johnson's "tendency toward exaggeration" as exhibited by her medical records, such as Dr. Khan's examination in May 12, 2008, that reflected Johnson being in "no visible distress" though with tenderness over the wrists and forearms. (Tr. 641 (citing Tr. 328; *see also* Tr. 329, 330).) The ALJ observed other instances of possible exaggeration, including Johnson's refusal to have blood work done due to pain and failure to even attempt a formal functional capacity test three times.[1] (Tr. 642, 652.) The ALJ recorded his in-person observations of Johnson: "At the outset it was apparent that unlike her presentation at the earlier hearing, this time claimant was quite lethargic and appeared to be under the influence of an unknown substance, making questioning of her rather challenging. At the same time she did not appear in pain sitting without any demeanor of discomfort." (Tr. 650.) This finding of lack of evidence of Johnson's discomfort at the hearing, based on the ALJ's personal observation, deserves deference.

Very importantly, the ALJ discussed the medical records from consulting Dr. Kimberly Ridl, who examined and tested Johnson. Dr. Ridl's records heavily suggested Johnson exaggerated her conditions. As the ALJ put it:

---

[1]The court noted in its prior remand decision that Johnson's inability to complete tests due to pain could be considered consistent with her testimony and complaints. However, it can also be considered as evidence of exaggeration and lack of effort. In the second decision, the ALJ links Johnson's failure to complete tests with other evidence in the record suggesting exaggeration and lack of effort.

Since the court's remand order a rather comprehensive consultative examination of the claimant was obtained. The findings from this examination reinforce and underscore some [of] the questions that the undersigned had regarding claimant's credibility. Claimant was seen on July 11, 2011 by Dr. Kimberly Ridl on referral by the Disability Determination Services in conjunction with a second set of Social Security Administration disability applications that she had filed (Exhibit 29F). At the outset of the examination claimant was "extremely vague" in her answers to questions posed. Through informal observation and a bit of deception Dr. Ridl was able to develop a more accurate picture of claimant's capabilities. As part of the physical examination, this included leading claimant to believe that she was being formally tested [on] one particular facet, when she in fact was informally being observed on some other facet, thereby making for a more accurate assessment of claimant's range of motion as well as various neurological measures. In doing so she was able to observe claimant performing complex movements in an uninhibited manner. Combining those observations together she concluded that there was full range of motion for both the upper and lower extremities, negative Phalen and Tinel signs (tests which are ordinarily associated with carpal tunnel syndrome) with sensation being intact, no difficulties on claimant's part with regard to fine motor use, and no evidence of any swelling. The most notable comments were a slightly reduced forward flexion of the lumbar spine which was contexted by the physician stating that claimant's effort was "questionable" and an "exaggerated" antalgic gait with claimant nevertheless able to walk on her heels and toes without difficulty. Dr. Ridl did offer a diagnosis of fibromyalgia, but felt claimant had the capacity for doing light work.

(Tr. 643; *see also* Tr. 652.) Dr. Ridl's report properly influenced the ALJ's consideration of Johnson's complaints and credibility. (Tr. 655.) This court has reviewed the records from Dr. Ridl and they confirm the ALJ's findings—Dr. Ridl found that Johnson could not be specific regarding her functional status, and her answers were "extremely vague." (Tr. 854.) The doctor found Johnson's effort in flexing to be questionable and that her gait appeared exaggerated. (Tr. 855.) And, as Dr. Ridl wrote, though Johnson's symptoms were compatible with fibromyalgia, "[s]he appeared very guarded during portions of the examination and stated she was unable to perform certain activities with her left arm,

however, when distracted and told we were focusing on another facet of the examination,

performed compound complex movements in an uninhibited manner." (Tr. 855.)

As noted by the ALJ, other treating physicians or medical personnel found that

Johnson's symptoms or pain did not match expected diagnoses or were inconsistent. For

instance, Dr. Gaines, who treated Johnson for complaints of headaches, stated in

November 2012 that she was

> "somewhat confused by her reported symptoms at times. Her symptoms are
> inconsistent." Specifically, she noted that in the past claimant described the
> headaches as being throbbing in nature with light and noise sensitivity, but
> no nausea or vomiting, but now she was describing them as "more of a
> bifrontal pressure incited by a light sensitivity. She no longer has noise
> sensitivity it seems. At times she states she no longer has migraines
> however has the 'set off' but after further clarification she states after these
> episodes she will then have a headache for approximately 2 days."

(Tr. 646 (citing Tr. 1308).)

The ALJ cited to records in which medical personnel questioned Johnson's reports

or effort during testing. For instance, treating physician Dr. Nwaeze wrote regarding

Johnson's claims of arm or wrist pain in 2013 that although her strength appeared minimal,

"'it is really hard to say this is due to pain or just a lack of effort.'" (Tr. 647 (quoting Tr.

1429.) Dr. Gaines in July 2013 noted giveaway weakness involving the left upper

extremity, but added that Johnson's effort was poor. (Tr. 647 (referencing Tr. 1580); *see*

*also* Tr. 1448 (therapist stating "[q]uestionable effort throughout session"), 1455 (therapist

stating that Johnson verbalized pain of ten out of ten regarding extending her arm, "but

then holds her purse up with her affected extremity").)

Johnson's shifting testimony at the second hearing supported the ALJ's questioning

of her credibility. Initially, Johnson stated that if her pain and physical problems

11

disappeared she could work.  (Tr. 694–95.)  She then revised that statement to say that she did not know how her bipolar condition and mood swings would affect her working, but she would be willing to try if the pain disappeared.  (Tr. 695.)  Johnson then said that her pain and bipolar condition were her top problems.  (Tr. 697.)

In addition, the ALJ noted statements by Johnson to her medical or therapy providers that conflicted with her testimony at the second hearing that she spent most of her time in bed and needed the help of her children and others for self-care and household tasks.  (Tr. 648.)  At the second hearing, Johnson testified that she did nothing around the house and it had been that way since the prior hearing.  (Tr. 683.)  She said she continued to need help bathing or getting dressed because of her arms, and the personal care worker made Johnson's meals while the children cooked for themselves.  (Tr. 683–84, 686.)  Johnson added that she was housebound except for medical appointments and that mainly she stayed in bed.  (Tr. 685, 688.)  According to Johnson, pain kept her from sleeping but she could generally sleep when taking her medication, though even with medication she sometimes was in so much pain that she could not sleep.  (Tr. 695–96.)

Johnson testified that during the hearing, on a scale of zero (no pain) to ten (the pain of childbirth), her pain was at a seven, which was a tolerable pain.  (Tr. 697, 700–01.)  However, she said that her pain was at a level ten about twenty days out of a month.  (Tr. 700, 703.)  When her pain was at a ten, she stayed in bed and canceled appointments.  (Tr. 703.)  She said her depression made the pain worse.  (Tr. 705.)  Further, Johnson testified that her leg pain "is so bad to where I can't lie in the bed with my legs straight, I can't cross them one over the other, I can't lie with them side like on top of the other or

anything to that magnitude." (Tr. 704.) She said she asked someone else to pick things up for her. (Tr. 704.)

In particular, the ALJ referenced a therapist's remarks that Johnson was busy accommodating her children's schedules and events, cooked for the holidays, searched for new housing and furnishings, went out to a family function and a fundraiser, and met friends. (Tr. 649 (citing Exs. 30F, 44F, 49F, 53F, 64F).) The court's review of the record finds support for the ALJ's conclusion, as Johnson's therapist's notes reflect Johnson's reports concerning cooking and tending to various needs of her children.

Johnson contends that the ALJ placed too much weight on the care she provides to her children—care that she was compelled to provide—and ignored the stress that such care created for her, as discussed in her records. In *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005), the Seventh Circuit rejected an ALJ's "casual equating of household work to work in the labor market: "Gentle *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts." Here, the ALJ did not improperly equate Johnson's activities with ability to work; instead, he properly used contradictions between her activities and her testimony that she was bed- or home-bound as part of his credibility determination. Further, this court finds that even without these references to Johnson's activities with her children, the ALJ's credibility determination would stand, as other evidence he cited was sufficient. Moreover, the ALJ pointed not only to compulsory family chores or needs, but also Johnson's search for new furnishings and social activity with family or friends. (Tr. 649.)

Finally, the ALJ observed:

Simply stated the diagnostics do not support the degree of pain alleged. Counseling notes show claimant very involved in the lives of her challenging kids. The physical therapy notes from the summer of 2013 emphasized that she was too busy at home to continue treatment. The multiple positive THC tests, questions of best effort at functional capacity evaluations (Exhibits 51F–52F) and the global assessment of functioning scores all tend to underscore legitimate concerns regarding claimant's credibility along with the very strong nature of the pain medication program versus limited objective basis for pain and the history of evidence of substance misuse. At her most recent hearing claimant intimated that she was essentially homebound, which clearly is not reflected in the medical record. Her claims that her pain exceeds the pain of childbirth and her testimony that her pain would have to be zero on a scale of 0–10 before she could tolerate a return to work also suggest that she may be poorly motivated to work.

(Tr. 655–56.) This last sentence, too, is supported by Johnson's testimony. (*See* Tr. 698.)

Johnson complains that the ALJ considered Johnson's marijuana use against her regarding credibility and improperly second-guessed whether repeated prescriptions for morphine, sulfate, oxycodone, Percocet, and other drugs were medically necessary. However, the ALJ's references to Johnson's marijuana use and possible drug-seeking behavior include tying those matters to compliance issues with pain-clinic rules, which together can reasonably be seen as questionable behavior by someone poorly motivated to get better.

Johnson complains about certain statements by the ALJ that constitute speculation—in particular the ALJ's comment that

[o]ne would expect that if claimant were as incapacitated as was being claimed, at some point [two of her providers] would have notified social services of any potential danger that she posed to her children. There has been no such documentation, leading the undersigned to believe that they both considered claimant to be more than competent and capable as a parent.

14

(Tr. 653.)  In addition, the ALJ noted that Johnson's extreme skin sensitivity and holding of her arm in an unusual way "could suggest a functional component to her presentation." (Tr. 641.)  Such statements that express the ALJ's own thoughts or extend into speculation were unnecessary and unhelpful.  However, they do not detract from or draw into question the validity of the ALJ's lengthy, and supported, credibility analysis.  The ALJ conducted a thorough examination of the medical records and testimony.

It is not this court's role to assess credibility on its own.  Instead, the ALJ's credibility finding should be affirmed if sufficiently supported.  And here, upon remand, the ALJ sufficiently, and quite thoroughly, supported his credibility finding.

B.     Physician and therapist opinions

Generally, the Commissioner gives more weight to the medical opinion of a source who examined the claimant than the opinion of a source who did not.  20 C.F.R. § 404.1527(d)(1).  Further, because of the unique perspective of and longitudinal picture from a treating physician, his or her opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record.  20 C.F.R. § 404.1527(d)(2); *accord* SSR 96-2p; *Ghiselli*, 837 F.3d at 776; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  "Controlling weight" means that the opinion is adopted.  SSR 96-2p.  A treating physician's opinion may have several points; some may be given controlling weight while others may not.  *Id.*

When evidence in opposition to the presumption is introduced, the rule disappears and the treating physician's opinion is just one piece of evidence the ALJ must consider. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).  Further, a treating doctor's opinoin

15

may properly be discounted if it was based on a claimant's subjective complaints rather than objective medical evidence. *Ghiselli*, 837 F.3d at 776.

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight "does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. In determining the weight to give a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialty of the physician, and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470.

The weight given to nonexamining sources "will depend on the degree to which they provide supporting explanations for their opinions" and "the degree to which these opinions consider all of the pertinent evidence." 20 C.F.R. § 404.1527(d)(3).

"Acceptable medical sources" regarding whether a medically determinable impairment exists include licensed physicians, psychologists, optometrists, podiatrists, and speech pathologists. 20 C.F.R. § 404.1513(a); SSR 06-03p. Evidence from other sources, such as nurse practitioners, physician assistants, social workers, chiropractors,

and therapists cannot establish the existence of an impairment.  But such evidence is nevertheless important and should be considered by the ALJ when evaluating an impairment's severity and functional effects.  § 1513(d); SSR 06-03p.  The ALJ should consider the length and frequency of the treatment relationship, the consistency of the opinion with the record as a whole, the degree to which and how well the source supports an opinion, the specialty and expertise of the source, and any other relevant factors.  SSR 06-03p.  Not every factor applies in every case; the evaluation of an opinion from such a source depends on the particular facts in each case.  SSR 06-03p.  Although there is a difference between what an ALJ must consider and what he or she must explain in the decision, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p.

    1.    Dr. Khan

In remanding Johnson's case previously, this court found that the ALJ had not sufficiently addressed the opinion of Dr. Khan, one of Johnson's treating physicians.  Dr. Khan treated Johnson from July 2007 to August 2010.  In May 2008, Dr. Khan diagnosed Johnson with carpal tunnel syndrome and limited Johnson to lifting, pushing or pulling no more than five pounds.  (Tr. 323, 387.)  Subsequently, on August 4, 2010, he completed a "Medical Assessment Form" in which he diagnosed Johnson with fibromyalgia and chronic pain (Tr. 551) and stated that during an average workday Johnson would need to take eleven or more breaks of twenty minutes each; could never lift any weight (even less than ten pounds); was unable at all to use her hands for grasping, turning, or twisting

objects; and was unable to use her fingers for manipulating or her arms for reaching (Tr. 553-54).

The ALJ's first decision in Johnson's case included an RFC that conflicted with Dr. Khan's assessment, as it provided no limitation for breaks, indicated Johnson could lift up to two pounds with her left hand and up to ten pounds total, and that Johnson could grasp and manipulate with her fingers, so long as it was not constant for the right hand or frequent for the left (Tr. 13). Further, the ALJ had not stated clearly the weight he was giving to Dr. Khan's opinion. The ALJ discussed that he had "generally used" Dr. Khan's findings, in some ways the RFC was more generous than Dr. Khan's, and that he had given "some weight" to Dr. Khan's findings. But the ALJ determined in a conclusory fashion that Dr. Khan's opinions that Johnson could not use either hand to reach or grasp and could not carry any weight were "inconsistent with the longitudinal medical record" and were not supported by a substantial change in Johnson's condition. (Tr. 17.) In doing so, he failed to discuss *how* Khan's opinion was not supported by medical evidence or specifically how it was inconsistent with other evidence, especially as the opinion at issue occurred after three years of treatment without symptom abatement and with additional diagnoses of fibromyalgia and chronic pain. Therefore, this court remanded the case for further consideration of Khan's opinion.

After remand, the ALJ devoted several paragraphs to Dr. Khan's records. He wrote that he gave little weight to Dr. Khan's opinions:

> The opinion expressed by Dr. Khan on May 12, 2008 that claimant could not lift more than 5 pounds (Exhibit 2F) and his subsequent letter on March 16, 2009 that claimant was incapable of any work are undermined by his limited contact with claimant and his inability to establish a clear etiology for the claimant's symptoms, deferring to the [sic] Dr. Ahmed, a neurological

specialist, who then himself expressed questions as to etiology. While an EMG-nerve conduction velocity study earlier done on September 13, 2007 had suggested "mild" bilateral carpal tunnel syndrome (Exhbiit 16F), the subsequent study as noted on July 16, 2008 was negative with no suggestion of a need for carpal tunnel release surgery.

(Tr. 642.) Further, the ALJ noted that Dr. Khan had not seen Johnson for over nine months

before his opinion that she was incapable of any work and that her last examination had

been notable only for skin sensitivity and the unusual position Johnson held her arm.

(Tr. 641.)

The ALJ noted the inconsistency between several medical opinions regarding

Johnson's conditions. He then remarked:

Looking at those various opinions leading up to the December 2, 2010 decision, Dr. Khan's opinion was not found to be entitled to significant weight although he was a treating source, having seen claimant on a number of occasions, albeit with subsequent gaps at times between those visits. His opinion conflicted with that of Sarah Luft, a physician's assistant at the Center for Pain Management, who as of September 13, 2009 felt that claimant was capable of sitting or standing/walking at least six hours in an eight hour workday and lifting up to 10 pounds (Exhibit 27F). Then there is Dana Washburn, an occupational therapist, who while placing claimant at a light level, a designation which by definition would include lifting up to 20 pounds . . . goes on to state that claimant could do no lifting (Exhibit 2F). Finally, there were the two Wisconsin Disability determination Service's nonexamining consultants: Dr. Baumblatt, who placed claimant at a light level (Exhibit 5F) and Dr. Foster, who on reconsideration placed her at less than full range of light work, including no more than occasional pushing/pulling with the left upper extremity, occasional gross handling/manipulation with the left upper extremity, treatment gross handling with the right upper extremity and frequent fine manipulation with both hands (Exhibit 12F).

(Tr. 642–43.) The ALJ found the incompatibility of the numerous medical reports to be a

basis for rejecting at least a portion of most of them:

As to physical capacity, after looking at all of the various treating, non-examining and consultative treating source opinions, the undersigned is hard pressed to adopt any specific one, most of them having at least some aspect

with which the undersigned takes issue. Probably the most compatible opinions would be those of the Disability Determination Services consultants, who appear to agree that claimant is capable of some degree of light work (Exhibits 5F, 12F, and 34F). While they obviously are not treating sources nor have they examined claimant, the undersigned finds that they bring with them a greater sense of overall objectivity compared to someone such as Dr. Khan. The undersigned, as previously emphasized, gives limited weight to Dr. Khan, finding that physician's opinions to be inconsistent with the medical evidence and his own contemporaneous progress notes.

(Tr. 655.)

Johnson contends that the ALJ reduced the weight of Dr. Khan's opinions improperly because Dr. Khan could not diagnose the cause of Johnson's pain, but instead wrote that the etiology was unclear.

In addition, says Johnson, the ALJ misrepresented Luft's notes. In this regard, the ALJ stated that Luft found Johnson was "capable of sitting or standing/walking at least six hours in an eight hour workday and lifting up to 10 pounds." (Tr. 642.) However, Johnson submits that Luft indicated she could *rarely* lift or carry ten pounds and could only use her hands, fingers, and arms for seventy-five percent of the time.

The court concludes the ALJ's reading of the record to be accurate. Luft's assessment was that Johnson could carry ten pounds only rarely but could *frequently* lift and carry less than ten pounds (Tr. 630)—and the ALJ used "up to 10 pounds" in his discussion. Frequent lifting of up to ten pounds conflicts with Dr. Khan's opinion that Johnson was not able to lift more than five pounds (Tr. 323). And Luft certainly did indicate that Johnson could sit and stand/walk at least six hours in an eight-hour workday. (Tr. 630.)

Johnson further asserts that the ALJ misinterpreted occupational therapist Washburn's opinions because contrary to the ALJ's finding, Washburn did not allow her

to lift ten pounds.  However, the ALJ did *not* state that Washburn so found.  Instead, the ALJ pointed out (reasonably) that Washburn's opinion was contradictory internally and to Dr. Khan's opinion, placing Johnson at a light level, which by definition would indicate ability to lift up to 20 pounds, while stating that Johnson could do *no* lifting.  (Tr. 642.)  Johnson contends that the ALJ also failed to inquire whether Washburn's "light duty level" had the same definition as "light work" in the Social Security context.  (*See* Doc. 21 at 23.)  Regardless, in the court's view any possible distinction between Washburn's "light duty work" and the definition of "light work" for Social Security benefits purposes[2] has no bearing on the ALJ's final decision, as Washburn's opinion was just a small portion of an enormous record, other parts of which demonstrated that Johnson could do light work with limitations.  (*See* Tr. 360 (consulting Dr. Baumblatt's opinion, cited by the ALJ (Exhibit 5F), stating that Johnson could lift ten pounds frequently and twenty pounds occasionally); Tr. 643 (citing Exhibit 36F, which indicated that Johnson could lift twenty pounds occasionally and ten pounds frequently (Tr. 931)).)

The ALJ's second decision stated that he gave little weight to Dr. Khan's opinion and now provides the required support for rejection of that opinion.  The ALJ pointed to the lapse of time between Dr. Khan's opinion and Johnson's previous appointment, inconsistencies between Dr. Khan's opinion and his prior notes, and inconsistencies among all of the medical records.

    2.    Davino

---

[2]Light work is generally considered lifting and carrying ten pounds frequently; lifting twenty pounds occasionally; standing or walking, off and on, for six hours during an eight-hour workday; intermittent sitting; and using hands and arms for grasping, holdings and turning objects.  *Clifford*, 227 F.3d at 868 n.2; *accord* 20 C.F.R. § 416.967(b).

Johnson contends that the ALJ should have given more credit to the opinions of counselor Danielle Davino. Davino, of Solutions Behavioral Group, saw Johnson for frequent mental health therapy beginning in June 2011, and counseled her for over three years. The ALJ stated that he gave little weight to Davino's opinions as she was not an acceptable medical source and her ratings were inconsistent with each other and after comparison to contemporaneous treatment notes. (Tr. 649.) Johnson acknowledges, social worker Davino was not an "acceptable source" whose opinions could have been given controlling weight. (*See* Doc. 21 at 23.) Nevertheless, she maintains that the ALJ should have considered Davino's opinions under SSR 06-03p, evaluating her opinions based on special knowledge of Johnson.

The ALJ provided adequate support for his consideration of Davino's opinions. The ALJ's discussion of Davino's treatment notes extended for almost two pages of his thoughtful twenty-three-page decision. At the start of that discussion the ALJ remarked that Davino's progress notes

> tend to consist largely of claimant's subjective complaints and anecdotal life events. There was little in the way of in depth clinical analysis or formal mental status examination results other than Ms. Davino checking certain boxes in those forms presumably intended to address the therapist's general perceptions or claimant during her visits (i.e. whether she was angry, depressed, anxious, hypervigilant, inattentive, etc.).

(Tr. 648.) Regarding Davino's functional capacity evaluations, the ALJ observed that Davino

> has been less than completely consistent. In an August 26, 2011 form she opined that claimant had "moderate" restrictions of activities of daily living, "marked" difficulty maintaining social functioning, "frequent" deficiencies with regard to concentration, persistence and pace, and "repeated" episodes of decompensation, yet at the same time opined that regarding handling the mental demands of employment, except for working at a consistent pace without interruptions or doing fast-paced work, she generally felt that

22

claimant's capacity for employment was fair (Exhibit 37F). Three months later she changed the rating for activities of daily living from "moderate" to "marked" to go along with the other more marked-extreme ratings, yet rated the various mental abilities and aptitudes needed by claimant to work as being "mostly" fair (Exhibit 41F). More recently in a form dated June 6, 2013 she opined that claimant's limitations as to activities of daily living were only "slight," while citing "moderate" difficulty with regard to social functioning, "often" deficiencies of concentration, persistence and pace, and "one or two" episodes of decompensation (Exhibit 55F). As to mental abilities and aptitudes needed for claimant to work, such were rated as falling between "fail" and "poor or none."

(Tr. 649.) The record supports the ALJ's discussion. Davino's assessments were not consistent throughout her treatment of Johnson. (*See* Tr. 938–39 (Ex. 37F), 1054–55 (Ex. 41F), Tr. 1403–04 (Ex. 55F).) Whether due to Davino's inconsistency or the changing mental abilities of Johnson, the differences in the assessments mean that the ALJ could not rely on one assessment over another. Further, it was not improper for the ALJ to take into account that many of Davino's notes included checked boxes on a form listing numerous mental status matters, such as "Worried," "Anxious," or "Hypervigilant," without significant individualized description of Johnson's condition and no in-depth clinical analysis, instead reflecting much of what Johnson was reporting. (*See, e.g.*, Tr. 1699.)

Johnson believes that the ALJ was wrong regarding Dr. Sami's note that Johnson's pain complaints, rather than depression, seemed to interfere with her activities. (Doc. 21 at 24 ("Contrary to the ALJ's belief, Dr. Sami did not state Plaintiff's pain symptoms were the primary reason to interfere with activities rather than depression.").) But that is exactly what Dr. Sami wrote. (Tr. 1397.)

In sum, the ALJ gave extensive consideration to Davino's, and Dr. Sami's, treatment records, thus providing the logical bridge to his light valuation of them.

3.      State-agency reviewing physicians

23

Johnson contends that the ALJ gave too much weight to the opinions of consulting Drs. Baumblatt and Foster, who placed her at a light-work level, when their opinions were given six years prior to the ALJ's second decision, without the benefit of over 1200 pages of additional, subsequent medical records. Similarly, Drs. Ruppert and Spear rendered their opinions in early 2009, without the benefit of those additional records, and the ALJ did not state what weight he gave those opinions. Generally, earlier state-agency opinions should not take precedence over later assessments that were based on a more comprehensive picture of the claimant's health at the time of a hearing. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Regarding these opinions, the ALJ's decision indicates his awareness that they preceded much of the medical evidence, and it is clear the ALJ considered them only as part of the much greater whole of evidence rather than dispositive. The ALJ referenced the opinions of Drs. Baumblatt and Foster in the section of his decision rejecting Dr. Khan's opinions. The opinions of all three doctors were contemporaneous, made before the ALJ's first opinion. Thus, it was acceptable for the ALJ to consider them together, notwithstanding that none of those physicians, Dr. Khan included, reviewed the latter 1200 pages of Johnson's record. Further, the ALJ considered the opinion of Dr. Khorshidi, expressly recognizing that Dr. Khorshidi's opinion issued after the remand order, allowing the doctor to view the more recent records. (Tr. 655.)

The ALJ referenced the opinion of Dr. Ruppert in the section of his decision addressing this court's concerns for remand of the first opinion. This court indicated that it was unclear in the first decision how the ALJ had considered Dr. Ruppert's opinion that Johnson's chronic pain would make completing tasks difficult. Consequently, the ALJ

24

explained in his second decision that the opinion of Dr. Ruppert (a PhD, not medical, doctor), was not within the psychologist's expertise, and instead he had relied on Dr. Ruppert's mental status examination results, which "were fairly unremarkable." (Tr. 641.) The ALJ again referenced Dr. Ruppert's, as well as Dr. Spear's opinions later, noting that their determinations preceded the ALJ's initial decision. (Tr. 648.) He then went on to describe the subsequent mental-health records, especially those of Davino, in great detail, confirming that the ALJ treated the opinions for what they were—opinions from prior to 2010, that were made without the benefit of later medical information. Thus, the ALJ used the opinions appropriately.

Further, Johnson argues, the ALJ failed to state exactly how much weight he gave to the opinion of Dr. Khorshidi, who reviewed Dr. Ridl's report. Regarding nonexamining, consulting Dr. Khorshidi's opinion, the ALJ first mentioned in passing: "Based in part on [Dr. Ridl's] examination, Dr. Khoshidi [sic] of the Disability Determination Services placed claimant at a light residual functional capacity (Exhibit 34F)." (Tr. 652.) Later, the ALJ mentioned that Dr. Khorshidi had the opportunity to review the recent records, including Dr. Ridl's, and that he was giving it, like the other consultants' opinions, "some weight." (Tr. 655.) Although the ALJ may not have specified exactly how much weight he gave the opinion, Dr. Khorshidi's opinion echoed Dr. Ridl's light-duty opinion, and the ALJ gave Dr. Ridl's opinion great weight. Therefore, a reasonable inference from the ALJ's opinion (notwithstanding the ALJ's failure to state so expressly) is that he gave Dr. Khorshidi's opinion a fair amount of weight as well. The court notes that the ALJ's decision would be affirmed even without Dr. Khorshidi's opinion, as Dr. Ridl's testing and opinion bore such significant weight with the ALJ that Dr. Khorshidi's opinion was likely unnecessary.

In addition, Johnson asserts Dr. Ridl was guessing as to her ultimate ability to perform full duty work when she opined that Johnson would be able to work a forty-hour week in light duty until her symptoms were managed with trigger-point injections and Cymbalta, when she would most likely be released to full duty (*see* Tr. 856). But in the court's view, this guess by Dr. Ridl did not factor into the ALJ's decision. The ALJ cited Dr. Ridl's report for the doctor's observations about Johnson's claims, the results of testing using deception as to what was being tested, and the doctor's opinion that Johnson had the capacity for light work—not the doctor's speculation about a future release to full duty. (*See* Tr. 643, 652.)

In sum, the court concludes that the ALJ's assessment of the medical providers' opinions was supported by substantial evidence in the record.

C.    RFC

Johnson complains that the ALJ "added a few more nonexertional limitations, giving claimant the benefit of the doubt to some extent due to her credibility issues, [but] he failed to state on which medical opinions he relied or which of claimant's credibility issues he accepted," thus failing to build the required logical bridge. (Doc. 21 at 26.) The ALJ did state that he accepted "that continuous standing or walking may be taxing on claimant by virtue of her back and knee complaints, aggravated by obesity. In so concluding, the undersigned is giving claimant the benefit of the doubt to some extent and not completely adopting the opinions from the Disability Determination Services." (Tr. 652.) This discussion about the "benefit of the doubt" followed immediately after a discussion of x-rays showing mild disc disease of the spine and degenerative joint disease of the knees. (*Id.*) Thus, the ALJ adequately pointed to the basis for finding that Johnson was *more limited*

than the consulting doctors' opinions indicated. The ALJ's subsequent statement towards the end of the decision that "[t]he Disability Determination Services opinions are given some weight, although the undersigned adds a few more nonexertional limitations, giving claimant the benefits of the doubt to some extent due to her credibility issues" (Tr. 655), followed more than fifteen pages of detailed analysis of the record. Thus, the ALJ supported his statement sufficiently.

Further, Johnson complains that although the ALJ noted that the most compatible opinions were those of the disability-determination-services consultants, he did not add Dr. Baumblatt's restrictions regarding occasional ability for left-upper-extremity handling, Dr. Foster's upper-extremity push/pull and gross and fine manipulation limitations, or Dr. Ridl's opinion that Johnson would be restricted to light duty until her symptoms were medically managed. (*See* Doc. 21 at 28.) However, the ALJ did not state that he was adopting the consultants' opinions in whole but inadvertently left out certain restrictions. Instead, the ALJ specifically stated that "[a]s to physical capacity, after looking at all of the various treating, non-examining and consultative treating source opinions, the undersigned is hard pressed to adopt any specific one, most of them having at least some aspect with which the undersigned takes issue." (Tr. 655.) Then the ALJ pointed out that the most compatible opinions were the consultants, "who appear to agree that claimant is capable of some degree of light work" (*id.*), indicating that the light-work level was the primary finding the ALJ was adopting. The ALJ, in fact, noted that Dr. Foster's belief that Johnson's perceived carpal tunnel syndrome would pose additional limitations conflicted with other evidence. (*Id.*) Overall, it is clear that the ALJ reviewed Johnson's entire record and synthesized and evaluated the various medical reports and opinions as to capacity.

Johnson contends that the ALJ failed to consider various opinions regarding her ability to maintain attention and concentration. (Doc. 21 at 28–30.) A vocational expert must consider deficiencies of concentration, persistence, and pace. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). The Seventh Circuit indicated that an ALJ need not use the precise terminology of "concentration, persistence and pace." *Varga*, 794 F.3d at 814; *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

*O'Connor-Spinner* concerned inadequate hypothetical questions posed to the vocational expert---the ALJ's RFC finding included limitations in concentration, persistence, and pace, but the ALJ had failed to include those limitations in any hypothetical posed to the vocational expert. *See* 627 F.3d at 619. The Seventh Circuit held that moderate restrictions in concentration, persistence or pace were not encompassed by the hypothetical's limitations requiring only simple, routine tasks. *Id.* at 618–21. Here, the ALJ's RFC finding did not include limitations in "concentration, persistence or pace" expressly. Thus, his failure to include those same limitations in a hypothetical did not violate *O'Connor-Spinner*. The ALJ addressed pace in a different way, limiting Johnson to "no production or pace rate work," and he included that limitation—and all of the RFC limitations—in the hypothetical posed. (*Compare* Tr. 657 with Tr. 709–11.)

Nevertheless, Johnson argues that the ALJ here needed to address concentration and persistence as well, especially as he was mindful of "moderate difficulties" in "concentration, persistence and pace" when discussing whether Johnson's conditions met the listings. (*See* Tr. 654.) She points to *Varga* and *Yurt*, for support. *Yurt*, however, is similar to *O'Connor-Spinner*. The ALJ found at step four that Yurt had "moderate difficulties"

with "concentration, persistence, or pace," but did not include those difficulties in a hypothetical for the vocational expert, and the vocational expert had not been otherwise apprised of the claimant's mental diagnoses. 756 F.3d at 859. Under *Yurt* and *O'Connor-Spinner*, if a claimant has limitations in maintaining concentration, persistence and pace set forth in RFC, those limitations must be spelled out in the hypothetical question posed to the VE. In the present case, the ALJ did not leave a step-four RFC finding out of the hypothetical.

*Varga* is better support for Johnson. A consulting psychologist had reviewed Varga's records and opined that she had moderate difficulties in maintaining concentration, persistence, or pace. 794 F.3d at 811. The vocational expert had been asked to opine on an individual who was able to perform "simple, routine, or repetitive tasks in a work environment . . . free of fast paced production requirements, involving only simple work related decisions with few if any work place [sic] changes and no more than occasional interaction with coworkers or supervisors." *Id.* at 812. The ALJ had found that Varga had moderate difficulties in concentration, persistence, or pace at steps two and three of his analysis, but did not include those difficulties in his hypothetical question to the vocational expert. Nor did the ALJ include those limitations in the RFC, which limited Varga to "simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions with few if any work place [sic] changes." *Id.* at 813. The Commissioner argued these RFC limitations accounted for Varga's mental limitations, but the Seventh Circuit rejected the argument, stating that these limitations

> fail to account for all of Varga's difficulties maintaining concentration, persistence, and pace, which, as the record shows, were related to her diagnosed anxiety and depression, as well as her physical problems and pain. "Few if any work place changes" with limited "interaction with coworkers or supervisors" deals largely with workplace adaptation, rather than concentration, pace or persistence. It is also problematic that the ALJ failed to define "fast paced production." Without such a definition, it would have been impossible for the VE to assess whether a person with Varga's limitations could maintain the pace proposed.

794 F.3d at 815. Further, the court stated that if moderate difficulties of only concentration existed, they would not be "encapsulated" by a restriction to work free of fast-paced production requirements. *Id.* at 816 n.3.

Here, the court finds that unlike *Varga*, no one seems to have been confused about the meaning of "production or pace rate work." The vocational expert did not ask for clarification, and Johnson's counsel did not object to the hypothetical on the grounds that the terms was uncertain. (*See* Tr. 709–22.) In *Cihlar v. Colvin*, No. 15-cv-560-bbc, 2016 WL 4742341 (W.D. Wis. Sept. 12, 2016), *appeal filed*, No. 16-3894 (Nov. 14, 2016), Judge Barbara B. Crabb faced a similar situation where the claimant argued on appeal that the ALJ's hypothetical was not an adequate reflection of her limitations regarding concentration, persistence or pace. Judge Crabb found that the claimant forfeited that objection by failing to object to the hypothetical at the hearing. *Id.* at *4.

Moreover, in *Cihlar*, Judge Crabb found that an RFC and hypothetical limiting the claimant to work "with no constant decision-making or work place changes, [and] no production pace rate" adequately accounted for the claimant's moderate restrictions as to concentration, persistence or pace. *Id.* at *2–*4. As Judge Crabb discussed, difficulties in concentration, persistence or pace at step three are not themselves limitations; instead, they are "merely a way for the administrative law judge to describe and assess the severity

30

of plaintiff's actual, credible mental health limitations" at that step. *Id.* at *4. The mental RFC assessment at step four "'requires a more detailed assessment by itemizing various functions contained in the broad categories'" of the listings. *Id.* (quoting SSR 96-8p). Judge Crabb found that the ALJ's limitations regarding no constant decision-making, workplace changes and production pace rate sufficiently accounted for the claimant's learning disorder. *Id.* at *3. And the claimant did not identify any other mental health problems that the ALJ failed to consider. *Id.* at *4.

In *Varga*, the ALJ had failed to provide the more detailed assessment of the RFC that was required at step four. In contrast, in *Cihlar*, the ALJs provided the more detailed assessment that was required in addressing the claimants' particular mental conditions. Here, like *Cihlar*, the ALJ provided the required detailed analysis. He determined an RFC with "no constant decision-making or workplace changes" and "no production or pace rate work." (Tr. 657.) In reaching that RFC the ALJ referenced evidence from Dr. Sami that Johnson's pain complaints, rather than her depression, seemed primarily responsible for an interference with her activities. (Tr. 650 (citing Ex. 54F), 653.) He stated that

> it seems quite clear that from a mental perspective she has the capacity for unskilled, routine types of tasks provided that they do not involve constant decision-making or workplace changes nor production or pace work types of demands. Some of her outside activities clearly demonstrate that when motivated claimant is able to attend to personal, household and childcare needs and act in a responsible manner. While that does not necessarily translate to being able to engage in substantial gainful activity, it does underscore a good grasp for attending to matters similar to what would be expected in a work environment.

(Tr. 654–55.) Thus, the ALJ considered Johnson's moderate *difficulties* regarding concentration, persistence, and pace but determined that the *limitations* in the RFC were the only limitations necessary to address those matters. As a consequence, Johnson has

failed to persuade this court that other mental health problems or limitations should have been found by the ALJ.

## CONCLUSION

For these reasons,

IT IS ORDERED that the Commissioner's decision is affirmed.

Dated at Milwaukee, Wisconsin, this 23rd day of February, 2017.

BY THE COURT

s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U.S. DISTRICT JUDGE